# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CT-00042-SCT

*ELIZABETH M. FLEMING*

*v.*

*BRANDY M. THOMAS FLOYD*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 12/06/2004 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROBERT E. O'DELL |
| ATTORNEY FOR APPELLEE: | H. BENJAMIN MULLEN |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED - 11/29/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.    Elizabeth M. Fleming sued Brandy M. Thomas Floyd in the Jackson County Circuit Court, alleging that Floyd's negligence caused an accident resulting in injuries and damages to Fleming.  A jury trial resulted in a verdict in favor of Floyd.  Fleming appealed to this Court, and we assigned the case to the Court of Appeals.  Finding that the jury gave too much weight to a police accident report while disregarding the testimony of Fleming's expert witness, the Court of Appeals reversed the final judgment of the Jackson County Circuit

Court in favor of Floyd and remanded this case to the trial court for a new trial. Upon

consideration of the record before us and the applicable law, we find that the Court of

Appeals improperly re-weighed the evidence; therefore, we reverse the judgment of the Court

of Appeals and reinstate and affirm the final judgment of the Circuit Court of Jackson

County.

### FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.     Elizabeth Fleming filed suit in the Jackson County Circuit Court on October 31, 2000,

alleging that the negligence of Brandy Thomas Floyd[1] was the sole proximate cause, or a

proximate contributing cause, of an accident which resulted in injuries and damages to her.

¶3.     A jury trial was duly conducted November 1-2, 2004, with Judge Dale Harkey

presiding. At trial, Fleming testified that she lived at 1021 Old Spanish Trail in Gautier.

Fleming's driveway is on the south side of Old Spanish Trail, and the driveway is situated

in a curve for approaching eastbound traffic. Fleming, who was on her way to a store to buy

---

[1]At the time of the accident, Brandy Thomas was dating Conner Floyd. Subsequent
to the accident, Thomas married Floyd. When Fleming filed her Complaint commencing
this action, she also named Conner Floyd as a party-defendant pursuant to a negligent
entrustment theory because he owned and insured the vehicle that Floyd was driving at the
time of the accident. However, the record reflects that at trial, Fleming focused only on
Brandy Floyd's negligence, and presented no theory of recovery against Conner Floyd via
jury instructions. The form of the verdict instruction (Jury Instruction No. 16) offered the
jury only two options, either finding for the plaintiff, Fleming, and assessing damages, or
finding for the defendant, Brandy Floyd. The jury rendered a verdict in favor of the
defendant, Brandy Floyd, and the trial court entered a final judgment in favor of Brandy
Floyd, consistent with the jury verdict. Fleming's notice of appeal reflects that she is
appealing from the final judgment entered in favor of Brandy Floyd. There is no issue
before us regarding the finality of the trial court judgment. *See* Miss. R. Civ. P. 54(b).

a shirt for her granddaughter at approximately 1:35 p.m. on November 14, 1997, pulled out from her house and drove to the end of her driveway. Fleming testified that she "looked several times in each direction" and that she looked left, right, then left again, a habit instilled in her through her driver's education class when she was fifteen years old. Fleming testified that it was a clear day and that it had not been raining, but that the view of the curve to the west was obscured because it was situated on a hill, and there were bushes on a neighbor's property.[2] Seeing no traffic on the road, Fleming pulled out of her driveway and onto Old Spanish Trail, attempting to enter the westbound lane of travel. While Floyd was traveling around the curve going east, she collided with Fleming. Officer Don Jones, a Gautier policeman, arrived on the scene and questioned Fleming and Floyd.

¶4.     On cross-examination, Fleming testified that four days after the accident, she hired a lawyer because she felt that Floyd was being untruthful to her (Floyd's) insurance company regarding her speed at the time of the accident. In Fleming's opinion, Floyd was "flying" when she ran into her. Fleming further testified that she hired an attorney and an accident reconstruction expert because her insurance company advised her to do so to prove her claim so that Floyd's insurance company would pay the damages. Fleming also testified that she did not fail to yield the right-of-way to Floyd because she looked and did not see Floyd when she pulled out onto Old Spanish Trail. Likewise, Fleming testified that Floyd was traveling in the eastbound lane when she (Fleming) first saw her.

_____

[2]However, the photographs entered into evidence indicate that Fleming's view from her driveway looking back to the west was not as obscured as she would have us believe.

3

¶5.    Fleming called as a witness James Bowman, who was tendered as an expert in accident reconstruction, and the trial court, without objection from Floyd, accepted Bowman as an expert in that field.  Bowman testified that he had conducted tests at the accident scene to determine the speed and location of the vehicles on the roadway at the time of the accident.  Bowman said that he had conducted two tests on the roadway, one when it was dry and one "after a light drizzle" because, as he testified, he believed the roadway had some moisture on it from a previous rain.  His test on the dry roadway was conducted with a coefficient of friction of .9, while the test on the wet roadway was conducted with a coefficient of friction of .7.  The coefficient of .7 reduced the speed at which Bowman believed Floyd had been traveling.  Bowman further testified that he "always gives the driver the benefit of the doubt and always use[s] the lowest coefficient of friction."  From those tests, Bowman determined that Floyd was "driving too fast for prevailing conditions" and that "had she been within the speed limit or even a slower speed, that the collision would not have happened."  The posted speed limit in the area was thirty miles per hour.  Bowman opined that Floyd was traveling at least forty-seven miles per hour when she began to skid[3] into Fleming, and seventeen miles per hour at impact.  Bowman determined the speeds of the vehicles at impact by conducting a "360 momentum" study based upon the positions and weights of the vehicles after the accident.  Also, Bowman opined that Fleming was traveling

---

[3]Thus, Bowman concluded that Floyd was going 47.5 miles per hour when she first "perceived" Fleming at 205 feet away.  Bowman further concluded that Floyd's vehicle traveled approximately 111 feet before she slammed on her brakes, thus locking her brakes and making a slide of approximately ninety-four feet into Fleming's vehicle.

"between three and a half to four and a half miles per hour" at impact. Bowman also testified that he believed that it was impossible for Fleming to see Floyd before she exited her driveway and that Fleming's vehicle was close to the center of the road when Floyd first saw Fleming and reacted.

¶6.  Bowman testified that, based on the weather report, the "whole week, it had been rainy, even up to that morning, it had been rainy." He believed that moisture on the roadway was the reason Floyd left only one skid mark,[4] rather than two. That skid mark left by Floyd was 93.91 feet in length. Bowman believed that Floyd was 205 feet from Fleming when she first "perceived" Fleming's car while in the curve, and that Floyd could not see Fleming's driveway from that point. However, Bowman went on to testify that Floyd would have first seen Fleming's front bumper when she (Fleming) began to pull out from her driveway, and if Floyd had been traveling at the speed limit of thirty miles per hour, her (Floyd's) skid would have been only forty-three feet rather than almost ninety-four feet. This would have allowed Fleming to pull safely from her driveway, he opined, thus avoiding the accident.

¶7.  Continuing with this testimony, Bowman stated that, according to his calculations, if Floyd had been going "right at 45 miles per hour," rather than the 47.54 miles per hour he

_____

[4]Bowman testified, on direct examination, that he disagreed with the accident report written by the policeman who investigated at the accident scene. The accident report, which was admitted into evidence by stipulation of the parties at the request of Fleming's counsel, stated that Floyd's brakes were defective, thus leaving only one skid mark from Floyd's right tires instead of two skid marks by both the left and right tires on the roadway. However, Bowman testified that because the skid mark was straight rather than curved, there was no indication that Floyd's brakes were not working properly. In fact, the record reveals that Bowman actually tested the brakes on Floyd's vehicle.

believed she was going, the accident would have been avoided. Bowman believed that Fleming had not completed her turn into the westbound lane at the time of impact. In Bowman's words, Fleming "was not completely out of the eastbound lane." However, Bowman concluded that the accident occurred entirely in the westbound lane.

¶8.     On cross-examination, Bowman testified that, in his opinion, Floyd tried to stop and moved to the left to avoid Fleming, who was coming from Floyd's right. Further, Fleming and Floyd could see each other when Floyd was at "the top of that little grade and the curve," if they were looking as they should.

¶9.     Floyd's counsel also cross-examined Bowman about Officer Jones's accident report; however, neither party called Officer Jones to testify. We now refer to the record concerning the cross-examination of Bowman. For clarity, we note here that "Mr. O'Dell" is Fleming's counsel, and "Mr. Mullen" is Floyd's counsel:

> Q.     And you also notice on there the section where it says "contributing circumstances"?
> A.     Right.
> BY MR. O'DELL:  I object, Your Honor.
> BY MR. MULLEN: It's already in, he's testified about it.
> BY THE COURT:  Your objection based on?
> BY MR. O'DELL:  My objection, Your Honor, is where he's going with this. He's trying to get opinion evidence of the police officer into evidence. It's not admissible unless the police officer were here to sponsor it.
> BY THE COURT:  Well, that document has been admitted by stipulation. Overruled.
> BY MR. O'DELL:  Yes, Your Honor, it has, but the opinion evidence is not admissible unless the officer is here to sponsor any opinions stated in the . . . I've had

6

that ruling against me before, Your Honor, so I'm familiar with that one.

BY MR. MULLEN: Judge, the entire document went into evidence.

BY THE COURT:   Overruled.

Over the continuing objection of Fleming's counsel, Bowman discussed Officer Jones's accident report completed at the scene. The accident report contained block codes for Officer Jones to mark appropriately, along with a space to write a narrative description. The report contained the following opinions: (1) Fleming had failed to yield the right-of-way; (2) there was no improper driving on Floyd's part; (3) the roadway was dry; and (4) Floyd's brakes may not have been working properly. Fleming had stated to Officer Jones that she was pulling out of her driveway and did not see Floyd's vehicle until it was too late to avoid being hit. Nothing in the report indicated that Floyd had been speeding.

¶10.   Bowman then testified that the rate of error of his calculation of Floyd's speed was plus-or-minus two-and-one-half miles per hour. In other words, Floyd could have been traveling anywhere from forty-five to fifty miles per hour. Bowman went on to state that if Floyd was indeed traveling at forty-five miles per hour, the collision would not have happened. Bowman also testified that he believed the crash occurred as Floyd slammed on her brakes when she could see Fleming exiting her driveway.

¶11.   At the close of Fleming's case-in-chief, Floyd moved for a directed verdict, which the trial court denied. In her case-in-chief, Floyd testified that, on the day of the accident, she was traveling home from Vancleave High School, where she was a student. She was familiar with Old Spanish Trail as she traveled it twice a day at least five days each week. Floyd

7

further testified that as she came to a certain position on the curve in the road, she could see Fleming's driveway and that she saw Fleming's vehicle sitting "at a dead stop" at the end of the driveway, with her front bumper out in the road. Floyd then veered slightly to the left. Floyd stated that she saw Fleming look to her right, but not again to her left; instead, Fleming then looked straight ahead and proceeded to pull out onto Old Spanish Trail. Floyd had assumed that Fleming would remain stopped in her driveway and that she (Floyd) could proceed; however, Fleming had proceeded into the roadway, and Floyd had slammed on her brakes when she realized that Fleming did not see her coming. Floyd skidded in the road and collided with Fleming's vehicle. Floyd likewise testified that she did not know exactly how fast she was traveling, but she did not think she was going forty-seven miles per hour as testified by Bowman. Instead, Floyd believed that she was traveling within the posted speed limit of thirty miles per hour. Floyd further testified that she always slowed down in this particular area because a day-care center was located there.

¶12. After hearing the trial court's jury instructions and closing arguments, the jury deliberated and returned a unanimous verdict in favor of Floyd. On November 3, 2004, the trial judge entered a judgment consistent with the jury verdict in favor of Floyd. On November 5, 2004, Fleming filed a motion for a judgment notwithstanding the verdict on the issue of liability and for a new trial. By order entered on December 6, 2004, the trial court denied this post-trial motion, and this appeal ensued, whereupon this Court assigned this case to the Court of Appeals.

8

**PROCEEDINGS IN THE COURT OF APPEALS**

¶13. The Court of Appeals addressed three issues: (1) whether the opinion evidence contained in the accident report was admissible; (2) whether sufficient evidence supported the jury verdict; and (3) whether the jury verdict was contrary to the overwhelming weight of the evidence.

¶14. As to the first issue, the Court of Appeals found that Bowman was allowed to explain the opinion evidence in Officer Jones's accident report. However, the Court of Appeals disagreed with the trial judge's holding that, since the report was stipulated into evidence, "anything on the document could be explained."[5] *Fleming v. Floyd*, 2006 Miss. App. LEXIS 717, **6-7, ¶12 (Miss. Ct. App. Oct. 3, 2006). The Court of Appeals stated:

> We conclude that the effect of the parties' consent to admitting this accident report was more limited than the trial court ruled. Certainly such evidence as could be understood without scientific or technical knowledge was effectively in front of the jury when the document was admitted. Having a witness testify from that same level of understanding about the document does not go beyond the reach of the agreed admission of the document. The introduction of expert testimony, though, or offering another document explaining the codes, creates additional usable evidence that was not before the average juror simply from the stipulated document. Consenting to admit the report does not consent to allowing new evidence in the form of technical or scientific proof.
>
> Deciding that the stipulated admission did not permit the expert testimony does not end the analysis, though. The report was first discussed by the plaintiff Fleming's own expert, Jim Bowman. In his narrative explanation of his methods and conclusions, he presented evidence from the coded entries. It is true that the plaintiff's attorney did not specifically ask the witness for coded

_____

[5]Because Officer Jones made certain conclusions by noting the codes in the accident report, Bowman had to explain what the codes meant to the jury. Otherwise, the codes would have been meaningless to the jury.

information, but the witness was asked without counsel's imposing limits to explain how different pieces of evidence – including the accident report – allowed him to conclude that the accident was solely the fault of the defendant Floyd.

Experts are subject to cross-examination concerning the basis of their conclusions. *Hollingsworth v. Bovaird Supply Co.*, 465 So. 2d 311, 315 (Miss. 1985). The scope of cross-examination is not limited to the specific subject matter of the direct examination. M.R.E. 611(b). Bowman had been qualified as an expert for accident reconstruction. His testimony concerning the accident report and some of the coded information "opened the door" for the defense to pursue that line of questioning further. *Cooper Tire & Rubber Co. v. Tuckier*, 826 So. 2d 679, 687 (Miss. 2002). Since the plaintiff's attorney elicited expert testimony from his own witness about coded information on this report, he waived any objection to defense counsel's pursuing explanation of other codes.

*Id.* at **14-16, ¶¶23-25.

¶15. As to the second issue, the Court of Appeals discussed the sufficiency of the evidence:

Fleming argues that the trial court erred in denying her motion for directed verdict and later for a judgment notwithstanding the verdict. It appears that Fleming never moved for a directed verdict, but she did request a peremptory instruction and a JNOV.

. . . .

The evidence that Fleming finds so compelling concerns Floyd's speed. The only witness who analyzed the physical evidence available after the accident was the plaintiff's expert Bowman. He testified that Floyd was speeding, and that with such close margins between the occurrence and the avoidance of this accident, the speed was the sole proximate cause of the collision. *The defendant Floyd provided no expert of her own. She simply testified that she was not driving as fast as Bowman calculated*. Floyd said she saw Fleming looking in the opposite direction immediately before Fleming pulled out. Conversely, Fleming testified she looked to her left just before pulling onto Old Spanish Trail and was habitually extra-cautious about entering that street.

Fleming's expert Bowman examined the skid marks and made various assumptions to cause him to calculate that Floyd was driving at least forty-seven miles an hour in this thirty mile per hour zone. Bowman also believed

10

that it was impossible for plaintiff Fleming to have seen Floyd in time to avoid pulling out due to Floyd's excessive rate of speed.

. . . .

Though the evidence exonerating Floyd from having any fault in this accident was weak, there was at least some evidence on which jurors might rely. We do not find that as a matter of law Floyd had to be at fault.

*Id.* at **17-19, ¶¶28-30, ¶32 (emphasis added).

¶16.    Finally, as to the third issue, the Court of Appeals found, *inter alia*, that, even though Officer Jones's opinions from the accident report were admissible, the jury gave too much weight to that evidence. The Court of Appeals concluded that as to the failure of Officer Jones to note on the accident report that Floyd was speeding, Officer Jones "may have had little on which to base a conclusion about anyone's speed." *Id.* at **19-20, ¶34.

¶17.    From the exhibits, which included both ground and aerial photographs of the accident scene, as well as the "measurements" evidence, the Court of Appeals found that Fleming would have been unable to see an eastbound vehicle (approaching from the west) until that vehicle was only 200 feet away from her driveway. The Court of Appeals found that "[a]t forty-seven miles per hour, which is the only substantial evidence as to speed [of Floyd's vehicle]," and when considering all of Bowman's testimony concerning skid marks and other calculations Bowman made, this evidence "***required a finding that Floyd was exceeding the speed limit when she began to brake. Had the defendant Floyd been able to dispute that evidence with reliable expert testimony admissible under Rule of Evidence 702, there would have been a substantial jury question***." *Id.* at **20-21, ¶35 (emphasis added).

11

¶18. In continuing its discussion of the third issue concerning the weight of the evidence, the Court of Appeals found that the "overwhelming weight of evidence required a finding by the jury that any significant speeding would have been one proximate cause of the accident," and that because Officer Jones had not testified in this case concerning the bases for his conclusions on the accident report, "the jurors had no evidence on which to validate that opinion either." *Id.* at \*22, ¶36. Thus, the Court of Appeals concluded that "[t]his unverified opinion was not entitled to much weight in comparison to the opinion of a witness, qualified at trial as an expert, that Floyd was speeding." *Id.* at \*23, ¶37. The Court of Appeals also opined that "[i]f the jury perceived Fleming as the person whose failure to enter the roadway with care made a collision with the speeding Floyd unavoidable, perhaps it concluded that she was responsible. Mississippi long ago adopted comparative negligence principles." *Id.* at \*24, ¶38. On this point, we take particular note that the trial judge in the case *sub judice* gave Instruction No. 8, which was a comparative-negligence instruction. The Court of Appeals also found:

> The evidence that Floyd was also at fault is overwhelming. The speed at which ***the only reliable evidence indicates Floyd was traveling*** afforded both drivers less time to avoid the collision. All entities who negligently contribute to an injury should be allocated some fault. ***Dawson v. Townsend & Sons, Inc.***, 735 So. 2d 1131, 1134 (Miss. Ct. App. 1999). The jury's assessment of fault solely to Fleming is implausible based on the physical evidence. More importantly, the verdict was against the overwhelming weight of the credible evidence.

*Id.* at 24, ¶39 (emphasis added).

¶19. Finally, in finding that a new trial must be granted in this case, the Court of Appeals stated:

Ordinarily this court does not disturb the finding of fact by a jury, nor review such finding except to determine whether or not there is sufficient evidence, if believed by the jury, to support the verdict. . . . However, an exception to this rule may arise in exceedingly rare cases where, from the whole circumstances, the testimony is contradictory and unreasonable, and so highly improbable that the truth of it becomes so extremely doubtful that it is repulsive to the reasoning of the ordinary mind. In such a case we think it proper to award a new trial on the facts, and let another jury have an opportunity to weigh and judge the testimony at another time, and under different circumstances. *Thomas v. State*, 129 Miss. 332, 92 So. 225, 226 (1922) (quoted in *Edwards v. State*, 736 So. 2d 475, 485 (Miss. Ct. App. 1999)). Reversing due to deficiencies in the weight of evidence is not the functional equivalent of directing a verdict for the new trial. If a second trial has the same outcome as the first, such a jury reconfirmation would suggest that the judicial scales used to test for overwhelming weight in this record need to be recalibrated. "If the exact evidence and no more is admitted again, the fact that a different jury looking at the same proof reaches the same conclusion means that a second reversal would not necessarily be appropriate in the interests of justice." *Edwards*, 736 So. 2d at 484 (citing *Tibbs v. Florida*, 457 U.S. 31, 43 n. 18, 102 S. Ct. 2211, 72 L. Ed. 2d 652 (1982)).

*Id.* at **24-26, ¶40.

¶20.    In the end, the Court of Appeals found no merit in the first two issues (whether the opinion evidence contained in the accident report was admissible, and whether there was sufficient evidence to support the jury verdict); however, as to the remaining issue ( whether the jury verdict was contrary to the overwhelming weight of the evidence), the Court of Appeals found this issue had merit and thus reversed and remanded for a new trial. After Floyd's motion for rehearing was denied by the Court of Appeals, Floyd filed her petition for writ of certiorari,[6] which this Court granted.

---

[6]Although Fleming did not file a formal response to Floyd's petition for writ of certiorari, Fleming's counsel requested us to consider Fleming's response to the motion for rehearing before the Court of Appeals as her response to the petition for writ of certiorari,

13

**DISCUSSION**

¶21. While this Court's order reveals a general grant of Floyd's petition for writ of certiorari, we granted certiorari to address the Court of Appeals' opinion concerning the third issue on which it reversed the trial court's judgment and remanded this case to the trial court for a new trial. However, we have carefully considered all three issues which were raised before the Court of Appeals, and while we may not be in total agreement with the Court of Appeals regarding some of the language the court used in addressing the first two issues, we agree with, and adopt, the Court of Appeals' analysis and conclusions reached as to those issues. (Those issues are: whether the opinion evidence contained in the accident report was admissible, and whether there was sufficient evidence to support the jury verdict). We thus move now to the third issue.

> **WHETHER THE JURY VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

¶22. Our cases are legion discussing the appropriate appellate standard of review when considering the issue of whether a jury verdict is against the overwhelming weight of the evidence. In **Patterson v. Liberty Assocs., L.P.**, 910 So. 2d 1014, 1018 (Miss. 2004), we stated:

> The applicable standard of review is set forth in **Venton v. Beckham**, 845 So. 2d 676, 684 (¶¶ 26-27) (Miss. 2003) (citing **Walmart Stores, Inc. v. Johnson**, 807 So. 2d 382, 389 (Miss. 2001)):

which we have done.

14

> Where an appellant challenges a jury verdict as being against the overwhelming weight of the evidence or the product of bias, prejudice or improper passion, this Court will show great deference to the jury verdict by resolving all conflicts in the evidence and every permissible inference from the evidence in the appellee's favor. ***Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Ass'n***, 560 So. 2d 129, 131 (Miss.1989). "Only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal." ***Herrington v. Spell***, 692 So. 2d 93, 103-04 (Miss.1997).

*Id.* at 1018.

¶23.   The record reveals that Fleming testified that she "felt" she was in her lane of travel (the westbound lane) at the time of impact.  However, Fleming's testimony is contradicted by her expert's testimony.  Bowman testified that at the time of impact, Fleming was still in the process of pulling into the westbound lane and that Fleming had not gotten completely into the westbound lane.  We turn to Fleming's testimony:

Q.   And do those look to you to be fair and accurate representations of how the, where you were at the time of the accident and where the vehicles were positioned after impact?

A.   I felt like I was in my lane, going my way.

. . . .

Q.   So, what did you do when you pulled out?

A.   I pulled out as I do.  And I feel like I was in my lane.  And I . . . When I, when I realized that she was there so quickly, she was coming at me already.  It was just boom, that fast.  Just . . . Not long.

. . . .

Q.   What was the position of your vehicle?  The best you know from your–let me finish.

A.   I was headed in my lane, going to town.  West.

Q.   Let me finish my question, please, Elizabeth.  To the best of your knowledge–I understand it was exigency at the time, you know, something going on.  To the best of your knowledge, what was the position of your vehicle in relation to Old Spanish Trail?  Had it entered

15

the–entirely entered the westbound lane at the time that Ms. Floyd's vehicle struck you?

A. I feel like I was already in my lane.

Q. Completely.

Q. Completely. I feel like my whole car was there, is what I feel like.

Q. Had you straightened up–

A. Yes.

Q. –to the point where you were headed down the roadway?

A. Yes. I felt like I was. To my recollection of what I felt, what happened that day.

. . . .

Q. And you disagree with where the accident reconstruction expert has drawn your vehicle at the point of impact; don't you?

A. No, I don't disagree with him. It's just what I remember.

Q. Okay. Well, your recollection is that you were in the westbound lane and you had already started moving in a westerly direction.

A. Right.

Q. And he's got your vehicle there at sort of an angle, with part of it in the eastbound lane; is that right?

A. Yes.

Q. And you disagree with that, now; don't you?

A. Not necessarily. I . . . That was a very traumatic day for me, and I thought I was all the way in my lane. If he says I wasn't, I guess there's a, a measure of something there. I'm not going to disrespect some who is–knows how to do that.

Q. Well–and I don't want you to disrespect anybody, and I know you're not trying to, but I guess my question to you–let me ask you this way. Mr. Bowman, the accident reconstruction individual who drew that, he wasn't there on the day of this accident, was he?

A. No.

Q. So, he wouldn't actually have a recollection of what happened, because he didn't see it; right?

A. That's right.

Q. You were there. Correct?

A. That's right.

Q. And understanding, of course, it was traumatic, because it was an accident, your recollection, since you were there, was that you had gotten in the westbound lane and started going west. Right?

A. That's right.

Q. And that would be different from what he has drawn on this drawing, isn't it?

16

A. Slightly, yes.
Q. Slightly? All right.

On the other hand, Bowman testified that according to his calculations, if Floyd had been driving her vehicle at forty-five miles per hour, the accident would never have happened. Bowman was asked that "[i]n other words, [Floyd] wouldn't have had to have been going much slower at all for this accident to be avoided than your 47.54 miles per hour that you calculated," and Bowman responded that "[t]hey would not have crashed, yes." Specifically, Bowman testified:

> Q. All right. So, at 45, didn't you testify that this collision wouldn't have occurred?
> A. Right.

¶24. The reality of this case is that the jury had the benefit of the testimony of various witnesses, including Fleming, Floyd, and Bowman. Not only did the testimony of Floyd conflict with that of Fleming, and not only did the testimony of Floyd conflict with that of Bowman, but also Fleming's testimony conflicted with that of her own expert, Bowman, the accident reconstructionist. We are constrained to find, from the record before us and the Court of Appeals' opinion, that the Court of Appeals improperly re-weighed the conflicting evidence before the jury, which had the practical effect of improperly invading the province of the jury. The Court of Appeals found that "[t]he defendant Floyd provided no expert of her own. She simply testified that she was not driving as fast as Bowman calculated." *Fleming*, 2006 Miss. App. LEXIS 717, *18, ¶29. The Court of Appeals also found:

> There was no evidence to contradict that a ninety-four foot skid, which would have been even longer if not for the collision, required a finding that Floyd

17

was exceeding the speed limit when she began to brake. Had the defendant Floyd been able to dispute that evidence with reliable expert testimony admissible under Rule of Evidence 702, there would have been a substantial jury question.

*Id.* at **20-21, ¶35.

¶25.    Thus, we can reach but one conclusion – the Court of Appeals found that because Floyd did not have her own expert to rebut the testimony of Fleming's expert, there was no jury issue as to liability.  Such a conclusion is contrary to the law in Mississippi as to how the jury may consider expert testimony.  In *Daniels v. GNB, Inc.*, 629 So. 2d 595, 603 (Miss. 1993), we stated that "judging the expert's testimony and weight to be accorded thereto is the province of the jury." *Id.* at 603 (citing *Ford Motor Co. v. Cockrell*, 211 So. 2d 833, 837 (Miss. 1968)).  In *Chisolm v. Eakes*, 573 So. 2d 764, 767 (Miss. 1990), this Court stated that "[t]he jury may consider the expert testimony for what they feel that it is worth, and may discard it entirely." *Id.* at 757 (citation omitted).  In *BFGoodrich, Inc. v. Taylor*, 509 So. 2d 895, 903 (Miss. 1987), this Court stated:

> This Court, of course, is not the jury.  The weight and credibility of the witnesses, primarily experts, was for the jury, who were free to accept or reject whatever part of their testimony they chose.  See, e.g., *Jackson v. Griffin*, 390 So. 2d 287 (Miss. 1980).

*Id.* at 903.  *See also Tunica County v. Matthews*, 926 So. 2d 209, 215 (Miss. 2006) (long-standing rule in Mississippi that jury in eminent domain case "may reject or accept any expert testimony it chooses in cases involving land valuation").

¶26.    Consistent with our case law, the learned trial judge in today's case thoroughly instructed the jury in this case as to its solemn duties and responsibilities, including, *inter*

*alia*, how the jurors were to consider the evidence. In Jury Instruction No. 1, the jury was instructed that "[i]t is your exclusive province to determine the facts in this case and to consider and weigh the evidence for that purpose," and that the parties had "a right to expect that you will conscientiously consider and weigh the evidence and apply the law, and reach a just verdict regardless of what the consequences of that verdict may be." The jurors were further informed via this instruction that they were "required and expected to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness that testifies"; and that the jury had before it the testimony and statements of the witnesses and the exhibits received into evidence, and that they thus were "permitted to draw such reasonable inferences from the evidence as seem justified in the light of your own experience."

¶27. Of significant import, the trial judge in today's case also gave Jury Instruction No. 2, which stated:

> The Court instructs the jury that you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.
>
> You are the sole judges of the credibility or "believability" of each witness and the weight to be given to his testimony. In weighing the testimony of a witness you should consider his interest, if any, in the outcome of the case; his manner of testifying; his opportunity to observe or acquire knowledge concerning the facts about which he testified; his candor, fairness and intelligence; and the extent to which he has been supported or contradicted by other credible evidence.
>
> Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or non-existence of any fact. You may find that the testimony of a smaller number of witnesses as to any fact is

19

more credible than the testimony of a large number of witnesses to the contrary.

¶28.   Thus, based on these appropriate instructions, the jurors in the case *sub judice* were aware that, during deliberations, they could believe or disbelieve any part of, or all of, the testimony of any of the witnesses, including Fleming, Floyd and Bowman.  It can be reasonably inferred that the jury, by its verdict, obviously chose to believe Floyd when she testified, contrary to Bowman's testimony, that immediately prior to the collision, she was driving within the posted speed limit.[7]  It can be reasonably inferred that the jury, by its verdict, obviously chose to believe Floyd when she testified, contrary to Fleming's testimony, that Fleming did not look back in Floyd's direction prior to pulling out of her driveway and onto Old Spanish Trail.  It can be reasonably inferred that the jury, by its verdict, chose to believe Bowman when he testified, contrary to Fleming's testimony, that Fleming's vehicle was not totally in the westbound lane of travel when the collision occurred.

¶29.   Finally, we note that the trial judge also gave Jury Instruction No. 8, which was a comparative-negligence instruction; therefore, the jury certainly had the opportunity to find, from conflicting evidence, that both Fleming and Floyd were negligent and that their combined negligence was proximate contributing causes of the accident, thus allowing the jury to arrive at an award representing just compensation for Fleming, but then reducing that award by the percentage of Fleming's negligence.  Even so the jury, having this option, chose

---

[7]Although Floyd was not certain as to her speed, she drove this road twice a day and she stated that she always drove within the speed limit on this stretch of the road because of the day-care center in the area.

20

to find from the credible evidence that Fleming was negligent, and that Fleming's negligence was the sole proximate cause of the accident and her resulting injuries and damages.

¶30.   Certainly, when we consider the totality of the record, classic jury issues were created by the conflicting testimony of the witnesses, and thus it became the responsibility of the properly-instructed jury to determine what weight and credibility it wished to assign to the testimony of the various witnesses. With this being said, we can state with confidence that by allowing the jury verdict in favor of Floyd to stand, we are not by any stretch of the imagination sanctioning an unconscionable injustice. *Patterson*, 910 So. 2d at 1018 (citing *Herrington*, 692 So. 2d at 103-04). The jury verdict therefore is beyond the authority of an appellate court to disturb. *Id.* at 1022 (citing *Maddox v. Muirhead,* 738 So. 2d 742, 743-44 (Miss. 1999)).

## CONCLUSION

¶31.   For the reasons stated, we reverse the judgment of the Court of Appeals and reinstate and affirm the final judgment of the Circuit Court of Jackson County in favor of Brandy M. Thomas Floyd and against Elizabeth M. Fleming.

¶32.   **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED**.

**SMITH, C.J., WALLER, P.J., EASLEY, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR.  DIAZ, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J.**

**DIAZ, PRESIDING JUSTICE, DISSENTING:**

21

¶33. This Court has held that "[v]erdicts are to be founded upon probabilities according to common knowledge, common experience, and common sense, and not upon possibilities; and a verdict cannot convert a possibility or any number of possibilities into a probability." *Elsworth v. Glindmeyer*, 234 So. 2d 312, 319 (Miss. 1970). Furthermore, a jury's findings of fact must be "set aside when . . . [they are] clearly or manifestly against all reasonable probability." *Id.*

¶34. In the present case, the jury's determination that Floyd was not at fault for the accident is "against all reasonable probability." The overwhelming weight of the evidence showed that Floyd was speeding before she slammed on her brakes and collided with Fleming. Fleming's expert witness, Bowman, testified that, based on the tests he conducted at the scene of the accident, Floyd was traveling at least forty-seven miles per hour when she began to skid. Moreover, Floyd's vehicle left a ninety-four-foot skid mark on the road. According to Bowman, the skid mark would have been only forty-three feet if Floyd had been going thirty miles per hour. No evidence was presented to demonstrate how Floyd could have left a ninety-four-foot skid mark if she had been driving within the speed limit. The only evidence that Floyd was not speeding was her own self-serving testimony and the investigating officer's accident report. Because there was absolutely no evidence indicating that the officer's opinion that Floyd was not speeding was reliable or remotely accurate, his opinion was entitled to very little weight.

¶35. Furthermore, the evidence presented at trial that Floyd's speeding was a proximate cause of the accident was also overwhelming. Clearly, if Floyd had been traveling within the

22

speed limit, she would not have skidded as far as she did and crashed into Fleming. Moreover, Fleming would have had more time to pull out of her driveway into the westbound lane and avoid the accident if Floyd had been going slower.

¶36.    The jury's finding that Fleming failed to yield the right of way to Floyd and that this failure was a proximate cause of the accident was supported by the evidence.  However, the jury's apportionment of fault solely to Fleming was contrary to the overwhelming weight of the evidence.  In light of the physical evidence and the uncontroverted testimony of Fleming's expert witness, the jury's refusal to apportion any fault to Floyd strains credulity.

¶37.    The jury's verdict in this case was not founded upon probabilities, but upon the extremely unlikely possibility that Floyd was not speeding.  To allow the jury's verdict to stand "would [be to] sanction an unconscionable injustice." *Herrington v. Spell*, 692 So. 2d 93, 104 (Miss. 1997) (citations omitted).  Accordingly, the verdict should be set aside. *Id.*

¶38.    I would affirm the judgment of the Court of Appeals, reverse the judgment of the circuit court and remand the case for a new trial.  Therefore, I respectfully dissent.

**GRAVES, J., JOINS THIS OPINION.**

23